**FILED**

JUN 1 8 2002

LA____ W. PROPES, CLERK
CHARLESTON, SC

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| SABINA CAREY, | ) | CASE NO.: 2 01 2612 18BBG |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S BRIEF** |
| vs. | ) | **IN OPPOSITION TO DEFENDANT** |
| | ) | **ABC'S MOTION FOR SUMMARY** |
| ABC HOSPITALITY, LLC, | ) | **JUDGMENT** |
| and SHELBY SIMMONS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

The Plaintiff, by and through her undersigned counsel, respectfully submits this memorandum in opposition of Defendant ABC's Motions for Summary Judgment and would state the following:

## STATEMENT OF FACTS

In or about the beginning of April 2000, Plaintiff began working for Defendant ABC Hospitality in the housekeeping department in Charleston County, South Carolina. Plaintiff was under the supervision of Defendant Shelby Simmons, who was the manager of the Housekeeping Department.

During Plaintiff's employment with Defendant ABC Hospitality, Defendant Simmons made sexual remarks and touched Plaintiff inappropriately numerous times. Defendant Simmons would grab Plaintiff's buttocks and touch Plaintiff's breasts while both parties were employed with Defendant ABC Hospitality. During the entire course of Plaintiff's employment with Defendant Hospitality, Defendant Simmons was acting within the scope of her employment. The Plaintiff reported the lewd and inappropriate behavior of Defendant Simmons to other employees or agents of Defendant ABC,

specifically the Hotel Supervisor, Cheryl Reseck. Plaintiff resigned from her position because of the ongoing harassment on or around the middle of August 2000.

## **LEGAL ARGUMENT**

Defendant ABC claims that the Plaintiff's allegations are insufficient to establish a *prima facie* case of hostile work environment / sexual harassment in violation of Title VII. In <u>Oncale v. Sundowner OffShore Services, Inc.,</u> 523 U.S. 75, 118 S.Ct. 998, the court enunciated three separate ways to prove same-sex harassment. 1) if there were credible evidence that the harasser was homosexual; 2) the victim is harassed in such sex specific and derogatory terms by another same sex individual as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace; or 3) there is comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace. In this matter, the Plaintiff is able to show that same-sex harassment based on the first and second prongs of the test annunciated in <u>Oncale.</u>

Under the first prong, there is credible evidence in the record to show that Shelby Simmons, the perpetrator, was homosexual. In May of 2000, Plaintiff testified that Ms. Simmons grabbed her on the butt. (Exhibit 1). Plaintiff also testified that in June of 2000, Ms. Simmons grabbed her breasts. (Exhibit 2). Plaintiff also testified that in July of 2000, Ms. Simmons told the Plaintiff that one of the hotel rooms smelled like a vagina and then asked the Plaintiff to give her a hug. (Exhibit 3). In viewing these events in the light most favorable to the Plaintiff, it is clear that the implicit meaning of Ms. Simmons' conduct was to seek sexual gratification from the Plaintiff. In other words, it is clear that Ms. Simmons' discriminatory motivation was because of sex. Comments can reasonably be construed as "earnest sexual solicitation" if they are initiated (as by touching [the

plaintiff]). <u>English v. Pohanka of Chantilly, Inc.</u>, 190 F.Supp.2d 833. Ms. Simmons' touching the Plaintiff's breasts was corroborated by Cindy Perry, a co-employee. Ms. Perry stated that Ms. Simmons' may have brushed the Plaintiff's chest, did make a derogatory response regarding the Plaintiff's breast and tried to hug the Plaintiff. Ms. Perry also stated that "several times Shelby had made remarks about [my] body shape that were offensive" to her. (Exhibit 4). Ms. Simmons' sexually driven conduct toward women is also verified by the testimony of Ms. Daly, a co-employee of the Plaintiff, who was also supervised by Ms. Simmons. In response to the question whether Ms. Simmons ever touched Ms. Daly, she replied that no she couldn't because she would not let her and that she would not get that close to her. (Exhibit 5). Ms. Daly further testified that she "knew exactly where [Ms. Simmons] was going with this, into the sexual part...". (Exhibit 6). Ms. Daly additionally testified that Ms. Simmons gives the impression that she is making sexual advances to women (Exhibit 7). Ms. Daly testified that she told Ms. Simmons that "I don't play with females", in response to Ms. Simmons' sexual actions. (Exhibit 8). Based on the foregoing, it is clear that Ms. Simmons' conduct and harassment shows that she is homosexual and wants to have sex with women. At the least, the foregoing presents sufficient evidence supporting a material factual dispute that will require resolution by a trier of fact. <u>Federal Rules of Civil Procedure Rule 56 (c), 28 U.S.C.A.: Austin v. Minnesota Mining and Manufacturing Company</u>, 193 F.3rd 992 (1999).

In the alternative, Plaintiff's case can survive summary judgment on the fact that the foregoing conduct of Ms. Simmons shows that she has hostility toward women in the workplace. The court in <u>Oncale</u> stated that "harassing need not be motivated by sexual

3

desire to support an inference of discrimination on the basis of sex. A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific derrogatory terms by another women as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." Oncale, supra at 1002. The foregoing evidence clearly shows that Ms. Simmons is hostile towards women in her conduct at work. The Plaintiff testified about at least three incidents where Ms. Simmons was hostile towards her at work. The Plaintiff testified that Ms. Simmons grabbed her butt, grabbed her breasts and used the word vagina in a sexual manner towards her. (See Exhibits 1, 2 and 3). Ms. Daly, a co-worker of Plaintiff, testified that Ms. Simmons touched her on the butt and tried to hug her while they were at work. (See Exhibit 5). Additionally, Cindy Perry, another co-worker of Plaintiff, stated that "it was not uncommon for Shelby [Simmons] to discuss the housekeeper's body and that Shelby had more than once made offensive comments to Cindy about her body size: for example, telling she had a "big butt"." (Exhibit 9). It is important also to note that all of the housekeepers at the hotel were women.

Again, in the alternative, Plaintiff has presented sufficient evidence to show same-sex harassment by Ms. Simmons that shows she is hostile toward women in the workplace.

Plaintiff has also presented enough evidence to prove a prima facie case of hostile work environment under Title VII. In order to present a claim of hostile work environment, the Plaintiff must prove by a preponderance of evidence that (1) the harassment was because of sex, (2) the harassment was unwelcome, (3) the harassment was sufficiently severe or pervasive to alter the Plaintiff's conditions of employment to

create an abusive work environment, and (4) some basis exist for imputing liability to the employer. Smith v. First Union National Bank, 202 F.3rd 241 (4th Cir. 2000); See also English v. Pohanka of Chantilly, Inc., 190 F.Supp.2d 833 (4th Cir. 2002). Plaintiff has previously discussed the abundant evidence in this case that supports her claim that she was harassed because of sex in the foregoing sections of this brief. As previously stated, Plaintiff has presented ample evidence to show that Ms. Simmons, the harasser, was homosexual. In the alternative, Plaintiff has presented ample evidence to show that the harasser was motivated by general hostility to the presence of women in the workplace. (See again, Exhibits 1-9).

The second element requires the Plaintiff to show the harassment was unwelcome. The Plaintiff testified that after Ms. Simmons grabbed her butt in May of 2000, that she said "please don't touch me, nobody touch me." (Exhibit 10). The Plaintiff also testified that after Ms. Simmons grabbed her breast in June of 2000, she said "don't ever touch me, please. Don't touch me." (Exhibit 11). Plaintiff also testified that after Ms. Simmons made the sexual comment about the room smelling like a vagina, she said "please, stop it. I cannot take it anymore." (Exhibit 12). Plaintiff also testified that after Ms. Simmons tried to hug her after making the vagina comment, she said "No, you stay away from me; stay away from me." (Exhibit 13). Cindy Perry, Plaintiff's co-worker stated that Ms. Carey told Ms. Simmons in response to grabbing her breast "do not touch my breast". (See exhibit 4, Reseck Note dated 8-8-2000).

Sara Daly, another of Plaintiff's co-worker, testified that Ms. Simmons' sexual harassment of Ms. Carey was unwelcome. Ms. Daly testified that Ms. Carey said "I can't take it, I don't like to be touched" regarding Ms. Simmons grabbing her breasts. (Exhibit

14). Ms. Daly testified that she arrived in the area right after Ms. Simmons had grabbed Ms. Carey's breasts and heard Ms. Carey "going off on Shelby". (Exhibit 15). Ms. Daly was clearly testifying that Plaintiff did not welcome Ms. Simmons' sexual harassment. Additionally, Ms. Daly testified that after Ms. Simmons grabbed Plaintiff's breasts that Plaintiff was upset, that she was starting to cry and her face was red. (Exhibit 16). Accordingly, the Plaintiff has presented sufficient evidence to show that the harassment she was subjected to by her supervisor was certainly unwelcome.

The third element requires a showing that the harassment was sufficiently severe or pervasive to alter the conditions of employment to create an abusive work environment. As early as May of 2000, Plaintiff complained to the hotel manager about Ms. Simmons', her supervisor, harassing behavior. The hotel manager noted that Plaintiff stated "that Shelby touched her on occasion like a hug or touching her arm or back. She asked that I tell Shelby not to touch her." (Exhibit 17). Furthermore, Plaintiff testified that the sexual harassment continued in May and lasted throughout July of 2000. (See Exhibits 1, 2, 3 and 4). Ms. Daly testified that Ms. Simmons, the housekeeping supervisor, would touch members the housekeeping staff on the butt. She also stated that Ms. Simmons "does things like that, that's the way she communicated, I guess." (Exhibit 18). Ms. Daly additionally stated that Ms. Simmons' sexual behavior occurred throughout the whole time she worked for the hotel. Ms. Simmons also sexually harassed Cindy Perry. Ms. Perry stated that Ms. Simmons' made remarks about Cindy's body shapes that were offensive to her. (See Exhibit 4). Additionally, Ms. Perry stated that "Shelby had more than once made offensive comments to [her] about her body size; for example telling her she had a big butt". (See Exhibit 9). Therefore, it is clear that Ms.

6

Simmons' harassment was sufficiently severe or pervasive as Ms. Simmons sexually harassed at least three of her subordinate employees.

The evidence presented also shows that it altered the Plaintiff's condition of employment and created an abusive working environment.  This is shown throughout Plaintiff's testimony.  Plaintiff stated that she was shocked, embarrassed and felt like her dignity had been stripped (Carey depo, Page 61, Line 16); that her supervisor's harassment hurt her and made her cry and that she would work and cry and feel that her spirit was killed (Page 64, Line 10); that it shocked her and that she cried and that it was painful for her (Page 67, Line 9); that she could not take it anymore, that she was depressed, that she could not focus (Page 71, Line 16 through Page 72 Line 2); that the harassments upset her and that she could not focus on her job while she was cleaning rooms (Page 90, Line 12-22); and that Plaintiff had problems calming down, wasn't able to think, and didn't want anyone to stay close to her because she did not want the sexual harassment to happen again (Page 133, Lines 12-17) ( All references above contained in Exhibit 19).

Ms. Daly's testimony also verifies that Plaintiff was subjected to an abusive working environment by the pervasive sexual harassment of Ms. Simmons.  Ms. Daly testified that after Ms. Simmons made the sexual comment about the vagina and tried to hug Plaintiff, that Plaintiff was crying (Page 52, Line 7); that after Ms. Simmons grabbed her breasts that Plaintiff was upset and said she couldn't take it anymore (Page 56, Line 24 through Page 57, Line 5); and that after Simmons grabbed the Plaintiff's breasts that Plaintiff was upset, getting ready to cry, and her face was red. (Page 85, Line 5) (all references above contained in Exhibit 20).  Therefore, Plaintiff has presented abundant

evidence to show that the harassment was sufficiently severe or pervasive to alter the Plaintiff's conditions of employment and created an abusive work environment.

The fourth element of the hostile work environment claim under Title VII states that some basis must exist for imputing liability to the employer. In May of 2000, Plaintiff was sexually harassed by Ms. Simmons when she grabbed her butt. A few days later, Plaintiff reported the harassment to the general manager. (Exhibit 21). In June of 2000, Plaintiff reported the sexual harassment by Ms. Simmons when she grabbed Plaintiff's breast to the hotel manager a few days after it occurred. (Exhibit 22) Ms. Daly, Plaintiff's co-worker, also testified that Plaintiff informed her that she told Ms. Reseck about the incident and that the hotel was not investigating her complaint. Ms. Daly testified that Ms. Carey said "I'm just tired telling them and they not doing anything." (See Exhibit 22). Plaintiff also testified that after Ms. Simmons made the sexual comment about the vagina and tried to hug her, that she reported that incident to the hotel manager as well. (Exhibit 23). Plaintiff further testifies that after reporting the harassment twice, that it did not stop and it continued. (See exhibit 23, page 72, line 4). Ms. Daly additionally testified that Ms. Carey said "and if [the hotel will] do nothing to Shelby, I'm going to sue the hotel." (See Exhibit 23, page 71, line 16). Lastly, Ms. Daly testified that after Ms. Carey complained of Ms. Simmons' harassment to the hotel, that Ms. Simmons continued to work there. (Exhibit 23, page 87, lines 19-23).

In Defendant ABC's Response to Plaintiff's Request to Admit number 2 dated August 20, 2001, the hotel responded that Ms. Carey did not report the incidents of sexual harassment by her supervisor Shelby Simmons. (Exhibit 24). However, in the deposition of Ms. Reseck, the 30(b)(6) witness for the hotel, she testified that information

8

was not correct, because Ms. Carey did report the incident of sexual harassment. (Exhibit 25). Ms. Reseck testified that the only incident of sexual harassment that was corroborated, was the sexual use of the word "vagina". (Exhibit 26). However, in written statements that Ms. Reseck prepared that were not made available to Plaintiff's attorney until after all depositions were taken, Ms. Reseck stated that two incidents of sexual harassment were corroborated. On August 17, 2000, Ms. Reseck wrote that "we felt there was sufficient corroboration of the sexual harassment claims..." (See Exhibit 9). Ms. Reseck also testified that other than the complaint by Plaintiff that Ms. Simmons grabbed her butt, her breast and used the word "vagina" in a sexual manner, that she had no other complaints regarding Shelby Simmons. (Exhibit 27). However, in Ms. Reseck's written statement, May 2000, she stated that Ms. Carey told her that, "Shelby touched her on occasions like a hug or touching her arm or her back. She asked that I tell Shelby not to touch her." (See Exhibit 17). Ms. Reseck's testimony has serious gaps in credibility. This throws all of Ms. Reseck's testimony into question and clearly presents material issues that require resolution by a jury. Federal Rules of Civil Procedure Rule 56 (c), 28 U.S.C.A.: Austin v. Minnesota Mining and Manufacturing Company, 193 F.3rd 992 (1999).

Ms. Reseck also testified that the hotel had no specific sexual harassment policy in place. (Exhibit 28). Despite the Plaintiff putting the hotel on notice of the sexual harassment in May of 2000, June of 2000 and July of 2000, Ms. Reseck testified that she first met with Ms. Simmons to discuss the harassment on either August 8 or 9, 2000. (Exhibit 29). This shows that the hotel did not have an effective policy regarding sexual harassment and failed to investigate the Plaintiff's complaints regarding the sexual

harassment by her supervisor. Furthermore, Ms. Reseck testified that after the Plaintiff complained of the sexual harassment by her supervisor, Ms. Reseck did not follow up with Ms. Carey and give her information regarding the harassment. (Exhibit 30).

Defendant ABC claimed that they suspended Ms. Simmons after Plaintiff reported her third incident of sexual harassment by Ms. Simmons. If this is true, no one was ever told. Ms. Carey testified that she had no knowledge that Ms. Simmons was suspended or terminated. (Exhibit 31). Furthermore, Defendant's witness, Cynthia McKnight, the executive assistance to Ms. Simmons, testified that the hotel didn't tell anyone that Ms. Simmons had been suspended. (Exhibit 32).

Plaintiff testified that she was forced to quit her employment on the 15th, 16th, or 18th of August of 2000. Plaintiff further testified that she didn't know that Ms. Simmons had been fired and that she wanted to find a better job where there would be safety and no harassment. (Exhibit 33). Ms. Reseck testified that the hotel fired Ms. Simmons on August 21, 2000. (Exhibit 34).

As previously stated, the hotel had no specific policy regarding sexual harassment of it's employees. However, after Ms. Carey reported her sexual harassment by her supervisor, the hotel changed it's policy regarding sexual harassment, as noted by Ms. Reseck's testimony. (Exhibit 35).

Based on the abundant evidence referenced above, it is clear that the hotel had no policy regarding investigations of sexual harassment and failed to take any appropriate remedial actions to address the problem of sexual harassment. Therefore, it is clear that Plaintiff has established a basis for imputing liability to the employer.

As Plaintiff's brief clearly shows, there are numerous factual issues among Defendant's witnesses and the parties that require resolution by a jury.

## SUMMARY JUDGMENT STANDARD

"The party seeking summary judgment has the initial responsibility of demonstrating the absence of a genuine issue of material fact." Richardson v. The State Record Co., Inc., 330 S.C. 562, 499 S.E. 2d 822, 824-825 (Ct. App. 1998). "To withstand a motion for summary judgment, the nonmoving party need only submit sufficient evidence supporting a material factual dispute that would require resolution by a trier of fact." Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.; Austin v. Minnesota Mining and Manufacturing Company, 193 F.3rd 992 (1999). If there are genuine issues of historical fact respecting officer's conduct or its reasonableness under circumstances, summary judgment is not appropriate, and issue must be reserved for trial. Pritchett v. R.N. Alford, et al., 973 F.2d 307 (1992).

The Plaintiffs, by and through the facts of the case, have established there are genuine issues as to the treatment rendered to the Plaintiff by the Defendants. In determining whether any triable issue of fact exists, as will preclude summary judgment, "the court must accept the factual allegations in the Complaint and must construe them in the light most favorable to the plaintiff." Martin Marietta Corp. v. International Telecommunications Satellite Org., 991 F.2d 94, 97 (4th Cir. 1992); IAC International, Inc. v. J. Gordon James, et al., 1996 WL 751454 (E.D. Va.).

"Summary Judgment is not appropriate where further inquiry into the facts of the case is desirable to clarify the application of the law." Tupper v. Dorchester County, 326 S.E. 318, 487 S.E. 2d 187 (1997); Baugus v. Wessinger, 303 S.C. 412, 401 S.E. 2d 169

(1991).  Even if the only dispute is how to draw conclusions or determinations from undisputed facts, summary judgment should be denied.  <u>Koester</u>, supra;  <u>Tupper</u>, supra.

At the summary judgment stage, the Plaintiff need not prove her case, only that there is a genuine issue of material fact regarding the merits of her claim.  For summary judgment to be granted, it must be perfectly clear no issue of facts are involved. <u>Piedmont Engineers, Architects and Planners, Inc. v. First Hartford Realty Corp.</u>, 278 S.C. 195, 293 S.E. 2d 706 (1982).  The moving party is not entitled to judgment as a matter of law if a fair-minded jury could return a verdict for the non-moving party on the evidence presented. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S., 242 (1986).

## CONCLUSION

Therefore, based on the foregoing, Plaintiff respectfully requests that the Court deny Defendant ABC's Motion for Summary Judgment.

Respectfully submitted,

J. DAVID MURRELL (Fed. I.D. # 7537)
Attorney for Plaintiff
8086 Rivers Avenue
North Charleston, SC  29406
(843) 553-9800

Charleston, South Carolina
18 day of June 2002

12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| SABINA CAREY, | ) | CASE NO.: 2 01 2612 18RB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CERTIFICATE OF SERVICE |
| ABC HOSPITALITY, LLC, and | ) | |
| SHELBY SIMMONS | ) | |
| Defendants. | ) | |
| | ) | |

The undersigned Paralegal for Plaintiff's counsel, J. David Murrell, 8086 Rivers Avenue North Charleston, South Carolina, 29406, does hereby certify that she has served the following named individuals and/or companies with a copy of the pleading indicated below by mailing a copy of same to them in the United States mail, with sufficient postage affixed thereto and return address clearly marked on the date indicated below:

Parties Served:

> J. Walker Coleman, Esq.
> Jenny A. Horne, Esq.
> Nexsen Pruet Jacobs Pollard & Robinson
> P.O. Box 486
> Charleston, SC 29402
> Attorneys for Defendant ABC

> Chalmers Johnson, Esq.
> P.O. Box 731
> Charleston, SC  29401
> Attorney for Defendant Simmons

Pleading:

> Plaintiff's Brief in Opposition to Defendant ABC's Motion for Summary Judgment

Janice L. Drobinski
Davidson, Bennett & Wigger
8086 Rivers Avenue
N. Charleston, SC 29406

This 18 Day of June, 2002.
Charleston, South Carolina.

# EXHIBIT "1"

53

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1          A.    No.

2          Q.    While you worked at the Holiday Inn

3    Express, were you ever -- were you ever disciplined

4    or suspended or anything like that?

5          A.    No.

6          Q.    Okay.  Ms. Carey, I would like for you to

7    please describe for me the incidents that you

8    perceive constituted harassment in the workplace

9    while you worked at the Holiday Inn Express.  I want

10   you to list each event that you believe was

11   harassment.

12         A.    The first issue, it was started in May as

13   I was having my cart to prepare the sheets, the soap

14   and shampoo, and bending down.  As is usual, every

15   morning she walks every floor, and she was with

16   Cynthia and herself, and I bending down, and I didn't

17   even thinking anything.  I felt she grabbed me on the

18   back -- my butt, and I just was shock.

19         Q.    When you say she grabbed you, what do you

20   mean?  Did she pat you on the back, or what did she

21   do?

22         A.    My butt.

23         Q.    On your behind?

24         A.    Yeah.

25         Q.    Okay.  What did you do?

54

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1       A.    I just shock, jump, and I said please

2   don't touch me, nobody touch me.

3       Q.    And what did she say to you when you said

4   that?

5       A.    She giggled.

6       Q.    I'm sorry?

7       A.    Giggled.

8       Q.    She was laughing?

9       A.    Giggling, yeah.

10      Q.    Is it possible she was just playing with

11  you, just joking with you?

12          MR. MURRELL:  Object to the form of the

13  question.

14          THE WITNESS:  I don't think so.

15  BY MR. COLEMAN:

16      Q.    You don't think she was joking even

17  though after she did it she was laughing?

18          MR. MURRELL:  You've got to answer.

19          THE WITNESS:  When somebody touch me, to

20  me, it's not joke.

21  BY MR. COLEMAN:

22      Q.    Okay.

23      A.    Nobody touch my butt.

24      Q.    I'm not asking you right now how it made

25  you feel.  Okay?  I'm asking you:  Do you think that

# EXHIBIT "2"

63

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1          A.    I had to finish my job.

2          Q.    Did you work the next day?

3          A.    I think so.  I don't remember if I had a

4    day off.  I did not the schedule.  I cannot say.  I

5    cannot remember.

6          Q.    Do you remember whether or not you worked

7    any of the days before you had the conversation with

8    Ms. Reseck?

9          A.    Repeat your --

10         Q.    Well, you said that the incident

11   happened.

12         A.    Yeah.

13         Q.    And you didn't tell Ms. Reseck for

14   several days.

15         A.    Uh-huh.

16         Q.    Okay.  Did you work in that interim

17   period?

18         A.    Yeah.

19         Q.    Did any other -- did Ms. Simmons do

20   anything else to you during that time period?

21         A.    No, I just keep working like regular.

22         Q.    When did the next incident occur?

23         A.    June.

24         Q.    In June?  Okay.  And what happened there?

25         A.    As I said, when she pass by to check on

64

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1    us, I was putting things together, and this time she

2    was with Cynthia.  With Cindy, not Cynthia, Cindy.  I

3    had a domin -- this in my neck (Indicating), and

4    Cindy, said, oh, it's a nice charm you have, and she

5    look at, and I said, yes, it's three color; it is

6    nice.

7              As I was showed her, Shelby grab my

8    breast, and, again, I said, don't ever touch me,

9    please.  Don't touch me.  And she said, you didn't

10   have big boobs, anyway.  And that -- again, it hurt

11   me, and I started to just crying.  Working -- I had

12   to work and cry feeling almost -- she killed my

13   spirit.  She stripped my dignity that day.  I feel

14   again worse than the first time.

15        Q.   Okay.  When she grabbed -- when she

16   allegedly grabbed your breast, did you say anything

17   to her?

18        A.   I said, don't touch me.

19        Q.   And how did she respond to you?

20        A.   The same thing, the giggling.

21        Q.   Okay.  She was giggling?

22        A.   You don't have no big boobs, anyway, she

23   said.

24        Q.   Did you think that maybe she touched your

25   breast accidentally?

65

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1            MR. MURRELL:  Object to the form of the

2      question.

3            THE WITNESS:  To say you don't have a big

4      boobs is not accident.

5      BY MR. COLEMAN:

6            Q.    Once again, do you think maybe because

7      she was laughing she was joking with you?

8            MR. MURRELL:  Objection.

9            THE WITNESS:  You ask me the same

10     question.  For me, there's no joke on my body.

11     BY MR. COLEMAN:

12           Q.    Okay.

13           A.    Nobody.

14           Q.    Let me ask you this:  Whenever you see

15     people in life throughout your life and you've seen

16     people, you know, who are doing things to each other

17     and are laughing while they're doing it, did you

18     perceive that those people were, you know, playing

19     with each other or joking?

20           MR. MURRELL:  Objection.

21           THE WITNESS:  I just come from different

22     culture, and I don't believe those things.

23     BY MR. COLEMAN:

24           Q.    So in your culture in Ethiopia, no one

25     ever joked with each other?

# EXHIBIT "3"

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1          Q.    Let me ask you this, then:  Do you

2    believe that you worked during that time period?

3          A.    Yes.  Yes.

4          Q.    And you don't know what Ms. Reseck did

5    after you told her that, do you?

6          A.    (Moves head from side to side.)

7          Q.    No?

8          A.    Repeat.

9          Q.    You don't know what Ms. Reseck did, what

10   actions Ms. Reseck took, after you told her?

11         A.    Yeah, I don't know.

12         Q.    All right.  So was there another

13   incident?

14         A.    When they said okay, she take care.

15         Q.    So you have one in May.  You have one in

16   June.  Were there any more?

17         A.    I believe another one was in the end of

18   July.

19         Q.    Okay.

20         A.    I came from -- because I go to the church

21   and then go straight to work, and so we start

22   working, and I think I was behind with Sara there.

23   She help to -- when we are a little bit late behind,

24   and she said, give me your key; I'm going to go open.

25   I said, okay.  Go ahead.  So I gave her the key.

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1          And she opened the door, and she said,

2    oh, my God, this room, it smell funky.  So, as she

3    said that, Shelby was pass by in the hall, and she

4    said, what you are talking about the room is smell?

5    And Sara said, it does smell funky.  I don't know.

6    The air conditioner is on or off.

7          So I finish with my cart to start to go

8    to work, and Shelby said, what you are talking about

9    the room smell?  And Sara told her, it smelled.  So

10   she came and said, oh, it smell like vagina.  And I

11   said, oh, my God.  I just left.  And I said, God,

12   don't talk like that.  It just disgusting.

13         So I left the room, and she said, well,

14   it doesn't smell like vagina.  I said, please, stop

15   it.  I cannot take any more.  As I was walking,

16   Nicole -- Niyokia was in the hall.  I said, I cannot

17   take any more of that thing, talking about like that.

18   So Sara told her to stop, to talk like that, too.

19         Q.   Sara told Ms. Simmons to stop?

20         A.   Yeah, both of us.

21         Q.   You told her to stop, as well?

22         A.   Yeah.

23         Q.   How did she respond to you?

24         A.   I said, I came from the church.  I don't

25   want to hear anything.  Just leave me alone.  And she

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1    said, you cannot joke.  Just come on and give me a

2    hug.  I said, no, you stay away from me; stay away

3    from me.

4          Q.   And how did she respond to you after

5    that?  Was she laughing again?  Was she giggling?

6          A.   I don't know.  I stay away in the hall

7    until she will leave.

8          Q.   Did she leave?

9          A.   I guess so because I didn't hear her

10   voice anymore.  So Sara and I, we start clean the

11   room.

12         Q.   So after that happened, you and Sara went

13   back to cleaning the room?

14         A.   Yeah, we finished cleaning.

15         Q.   Then what happened after that?

16         A.   I could not take any more.  I was so

17   depressed.  I was just like so disgusting feeling,

18   oh, God.  I just like, that's it.  I cannot take any

19   more.  I cannot stand and went home and cry, told my

20   friend, Luciana, told most of my friend.  My son I

21   told, my daughter.

22              I was just like so depressed.  I just --

23   I could not focus.  Every time I walk, sleep, it was

24   just keep coming.  I said, no, somebody has to stop

25   it.  It cannot continue like that.  So I just said,

# EXHIBIT "4"

Tuesday August 8, 2000.

Sometime Tuesday morning before noon, I received a call from Sabina. She sounded distressed and told me that she was going to file a complaint against the hotel for sexual harassment. She stated that Shelby had touched her bottom, grabbed her breast and used the word Vagina in her presence.

I asked for more detail. She told me that she had it all written down but that Cynthia had witnessed Shelby touch her bottom. She stated that Cindy had witnessed Shelby touch her breast. I asked when this happened as I had never heard this before. She said that Sara and Niyokia had heard her talk about her vagina. I asked her to please write down her claim and I would check into it. I was in a meeting with our Sales manager and I immediately went to check on these matters. Again, this was the first time I had heard about Shelby touching her breast or any incident on July 30 with inappropriate language. Sabina had requested to talk with the owners.

I first talked to Cindy Perry. She did not work on this day so I called her at home. I asked her if she recalled at any time Shelby grabbing Sabinas breast. She told me that there was a time about a month ago when she and Shelby were checking rooms. They had stopped at Sabina's cart and were talking. She said that Sabina had a charm on her necklace that hung low, approx. between Sabina's breast. She said she remembers Shelby reaching to look at the charm. She said that Sabina had pulled back and said "Do not touch my breasts", or something to that effect. She said Shelby may have brushed her chest but she does not remember if she did. Cindy said Shelby did make a derogatory response to Sabina something like "what breast?" or something similar referring to Sabina's breast size. I asked if she felt this was an intentional attempt for Shelby to grab or cup Sabinas breast. She said she didn't think so, that it was not intentional but remarks were made by Shelby about Sabina's chest size. She did recall Shelby trying to hug Sabina. Cindy also mentioned that several times Shelby had made remarks about Cindy's body shape that were offensive to her.

I talked to Sara Daly and asked her if she remembered an incident on July 30 where Shelby used inappropriate language. She described a similar incident that Sabina described on July 30. I asked Sara to write down what she calls about the incident and to turn it in.     I asked Niyokia if she had any knowledge of an incident of Shelby using inappropriate language on July 30. She said no that she was 4 or 5 rooms down the hall and did not hear anything first hand. She said she learned of the incident when she heard it second hand from Sabina shortly after on the same afternoon.

I was unable to reach Cynthia until Thursday to investigate if she had witnessed Shelby touch Sabinas bottom. When I did talk to her on Thursday, she again stated that she had never seen Shelby touch Sabinas or any other staff members bottom or any other body part.

Shelby came to me late Tuesday afternoon after hearing housekeepers discuss Sabinas intentions. I told her that I was investigating a claim and I would not discuss it with her until I had spoke to everyone involved. I asked her to have a supervisor work with her checking rooms until she was notified different.


*Cheryl Reseck*

Cheryl Q. Reseck

# EXHIBIT "5"

Sara Daly

1      A      We had ups and downs.

2      Q      Okay.  What were your ups?

3      A      Looking good today, feel good, she'd pat

4  me on the shoulder or whatever.

5      Q      Would she tell you you were doing a good

6  job?

7      A      Yeah, she would tell me I'm doing a good

8  job but I need to speed it up, speed it up.

9      Q      Okay.  What were some of the downs?

10      A      After she already told me about one room,

11  she'll come back again, and I call it harassing me,

12  and then I got slower.  'Cause when you're harassing

13  me, you're telling me something more than one time,

14  I don't know, it just does something to me and I

15  can't move.

16                        As long as you tell me what to

17  do, then I'm okay, don't come back and stand around

18  watching me doing it because then I get this little

19  thing in my head saying, hey, I'm not a kid, you

20  know, don't watch me clean 'cause I can clean.

21      Q      So that makes you angry?

22      A      That makes me angry, yeah.  But I didn't

23  say anything, I don't say anything, just leave me

24  alone, I got it.

25      Q      Okay.  Other than patting you on the back,

Sara Daly

1  did Miss Simmons ever touch you in any way?

2      A    No, couldn't.

3      Q    Okay.

4      A    I wouldn't let her.

5      Q    Did she ever attempt to touch you?

6      A    I have no idea 'cause I didn't get that

7  close.

8      Q    Okay.  So Miss Simmons never had an

9  opportunity to touch you?

10     A    Right.

11     Q    Okay.  Now, do you and Miss Carey, when

12 you worked there, did you ever do anything socially

13 outside of work?

14     A    No.  We promised to go to a movie together

15 but I never showed up, I never went.

16     Q    Okay.  So you never went to a movie

17 together?

18     A    Never went out with her.

19     Q    Did you ever go out to dinner together?

20     A    No, ma'am.

21     Q    Did you ever visit one another at your

22 homes?

23     A    She visit me once and I visit her once.

24     Q    Okay.  When was that?

25     A    Oh, lord, here we go again.

# EXHIBIT "6"

53

Sara Daly

1     Q     -- by using the word vagina?

2     A     No.

3     Q     Did it offend you?

4     A     A little bit, but then again I said,

5  that's her, I didn't pay her no attention.

6     Q     Did I offend you earlier in the deposition

7  when I referred to the word vagina?

8     A     No, because you was asking me a question.

9  It's a different situation.

10     Q     Okay.  And how was that situation

11  different than the situation in which Miss Simmons

12  said the word vagina?

13     A     Because I know exactly what she was

14  talking about, I mean, I knew that she was -- let me

15  see, how would I put it?  I knew exactly where she

16  was going with this, into the sexual part so that's

17  why I left it alone.

18     Q     Okay.  How did you think the room smelled?

19  Did you think the room smelled, first of all?

20     A     Yes, it did.

21     Q     Okay.  What in your opinion did the room

22  smell like?

23     A     It just had a foul odor that, what

24  happened was the guests closed the curtain, they put

25  towels to the door, and I don't know what else they

# EXHIBIT "7"

Sara Daly

1    A    All of us.

2    Q    Okay.  And you wrote on here, "I know

3  Shelby's fresh."

4    A    Yeah.

5    Q    And what did you mean by that?

6    A    Oh, lord, how can I explain that one?  She

7  does unappropriate things, you know, she would do

8  unappropriate things and don't think about it.

9    Q    And then you had, "She's not going to

10  touch me"?

11    A    Right.

12    Q    You're talking about yourself; right?

13    A    Right.

14    Q    And then you had, "She was told by me I

15  don't play with female."

16    A    Right.

17    Q    Did you feel like that she was trying to

18  flirt with women or make sexual advances to women?

19    A    It was hard to tell about Shelby, I'm

20  telling you, she, she give you that impression.

21    Q    Yeah.

22    A    And then, you know, so I just, that's what

23  I said.

24    Q    And then almost your last sentence says,

25  "All she does is smile but she knows."  Who are you

# EXHIBIT "8"

Sara Daly

1    A    All of us.

2    Q    Okay.  And you wrote on here, "I know

3 Shelby's fresh."

4    A    Yeah.

5    Q    And what did you mean by that?

6    A    Oh, lord, how can I explain that one?  She

7 does unappropriate things, you know, she would do

8 unappropriate things and don't think about it.

9    Q    And then you had, "She's not going to

10 touch me"?

11    A    Right.

12    Q    You're talking about yourself; right?

13    A    Right.

14    Q    And then you had, "She was told by me I

15 don't play with female."

16    A    Right.

17    Q    Did you feel like that she was trying to

18 flirt with women or make sexual advances to women?

19    A    It was hard to tell about Shelby, I'm

20 telling you, she, she give you that impression.

21    Q    Yeah.

22    A    And then, you know, so I just, that's what

23 I said.

24    Q    And then almost your last sentence says,

25 "All she does is smile but she knows."  Who are you



PLAINTIFF'S
EXHIBIT
Daly 5-1-02

July 30th, Sunday
Sabina and I was cleaning a check-
out Room, when we both enter the room,
Sabina and I said my God this room
smells awful. Shelby came inside
room and said whats smell, my they
must be getting iron. She went
out the room into the hall way
and was very loud and said
my vagina doesn't smell like it smells
like vagina. That's dirty. So I said whats
wrong with you? who said that it
did smell like that, the smell
is sort like underarm odor muss and the
air was off and curtain drawen.
Sabina walked out and said
Shelby, why are you talk like that
no one cares. And doesn't care about
something personal as that and I said
to her, who cares about your vagina
or not, Shelby kept on talking about
her vagina doesn't smell. I told
her to get out the room, go away!
I don't care to comment about what
smell bad or good we only want to
clean the room and leave. Sabina came

Sabina said that no one seem to care how she talks and act, so she's not going to stay here she's disrespectful to her employees. She's got to put a stop to her Loudness her talking and touching.

We clean the room sprayed, the odor had left we left the air on.

I told her well do what ever I know Shelby's fresh but saying these things in the hall way wasn't called for her personal body parts I have nothing to say. I don't go around smelling anyone. She's not going to touch me I know I won't let it happen. I would knock her lights out and then she would be smelling daises

She was told by me I don't play with female and I specially don't play with male I do my work if its not work relate stay away. all she does is smile but she knows. I take NO crap Give NO crap

# EXHIBIT "9"

August 17, 2000

Mrs. Thaker and I decided not to pursue a written statement from Sabina. We felt that the format of the claim was irrelevant.  Her verbal claim was enough to act on.

Reviewing Sabinas claims, there were three specifics that she brought up.  1.  Shelby touching her bottom.  2.  Shelby touching her breast and talking about her breast.   3.  The incident on July 30 where Shelby used profane sexual language in the presence of Sabina and others.

1.  Shelby touching Sabinas bottom.  There was no corroboration of this incident from Cynthia whom Sabina had said witnessed this happen.

2.  Shelby touching and talking about her breast.  Cindy had said she was present when Shelby reached for a charm that hanging between Sabinas breast.  She may have brushed her breast.  Shelby did make some derogatory comment about the size of Sabinas breast and Shelby did make an attempt to give Sabina a hug.

It was also noted that Cindy had also stated that it was not uncommon for Shelby to discuss the housekeepers body and that Shelby had more than once made offensive comments to Cindy about her body size; for example telling her she had a "big butt".

3.  July 30 incident where Shelby used profane sexual language in the presence of Sabina and others.  Sara Daly corroborated this incident in writing  exactly as  described it happened.  We questioned Sabina and Sara extensively on the incident.

With this information, we felt there was sufficient corroboration of the sexual harassment claims and because the hotel rule that discrimination or harassment of any type is not tolerated, we felt our only decision was termination.

Cheryl Reseck

Cheryl Q. Reseck

# EXHIBIT "10"

54

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1          A.    I just shock, jump, and I said please

2    don't touch me, nobody touch me.

3          Q.    And what did she say to you when you said

4    that?

5          A.    She giggled.

6          Q.    I'm sorry?

7          A.    Giggled.

8          Q.    She was laughing?

9          A.    Giggling, yeah.

10         Q.    Is it possible she was just playing with

11   you, just joking with you?

12         MR. MURRELL:  Object to the form of the

13   question.

14         THE WITNESS:  I don't think so.

15   BY MR. COLEMAN:

16         Q.    You don't think she was joking even

17   though after she did it she was laughing?

18         MR. MURRELL:  You've got to answer.

19         THE WITNESS:  When somebody touch me, to

20   me, it's not joke.

21   BY MR. COLEMAN:

22         Q.    Okay.

23         A.    Nobody touch my butt.

24         Q.    I'm not asking you right now how it made

25   you feel.  Okay?  I'm asking you:  Do you think that

# EXHIBIT "11"

64

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1    us, I was putting things together, and this time she

2    was with Cynthia.  With Cindy, not Cynthia, Cindy.  I

3    had a domin -- this in my neck (Indicating), and

4    Cindy, said, oh, it's a nice charm you have, and she

5    look at, and I said, yes, it's three color; it is

6    nice.

7                 As I was showed her, Shelby grab my

8    breast, and, again, I said, don't ever touch me,

9    please.  Don't touch me.  And she said, you didn't

10   have big boobs, anyway.  And that -- again, it hurt

11   me, and I started to just crying.  Working -- I had

12   to work and cry feeling almost -- she killed my

13   spirit.  She stripped my dignity that day.  I feel

14   again worse than the first time.

15                 Q.   Okay.  When she grabbed -- when she

16   allegedly grabbed your breast, did you say anything

17   to her?

18                 A.   I said, don't touch me.

19                 Q.   And how did she respond to you?

20                 A.   The same thing, the giggling.

21                 Q.   Okay.  She was giggling?

22                 A.   You don't have no big boobs, anyway, she

23   said.

24                 Q.   Did you think that maybe she touched your

25   breast accidentally?

# EXHIBIT "12"

70

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1          And she opened the door, and she said,

2   oh, my God, this room, it smell funky.  So, as she

3   said that, Shelby was pass by in the hall, and she

4   said, what you are talking about the room is smell?

5   And Sara said, it does smell funky.  I don't know.

6   The air conditioner is on or off.

7          So I finish with my cart to start to go

8   to work, and Shelby said, what you are talking about

9   the room smell?  And Sara told her, it smelled.  So

10  she came and said, oh, it smell like vagina.  And I

11  said, oh, my God.  I just left.  And I said, God,

12  don't talk like that.  It just disgusting.

13         So I left the room, and she said, well,

14  it doesn't smell like vagina.  I said, please, stop

15  it.  I cannot take any more.  As I was walking,

16  Nicole -- Niyokia was in the hall.  I said, I cannot

17  take any more of that thing, talking about like that.

18  So Sara told her to stop, to talk like that, too.

19        Q.    Sara told Ms. Simmons to stop?

20        A.    Yeah, both of us.

21        Q.    You told her to stop, as well?

22        A.    Yeah.

23        Q.    How did she respond to you?

24        A.    I said, I came from the church.  I don't

25  want to hear anything.  Just leave me alone.  And she

WILLIAM ROBERTS, JR., & ASSOCIATES

# EXHIBIT "13"

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1   said, you cannot joke.  Just come on and give me a

2   hug.  I said, no, you stay away from me; stay away

3   from me.

4           Q.    And how did she respond to you after

5   that?  Was she laughing again?  Was she giggling?

6           A.    I don't know.  I stay away in the hall

7   until she will leave.

8           Q.    Did she leave?

9           A.    I guess so because I didn't hear her

10  voice anymore.  So Sara and I, we start clean the

11  room.

12          Q.    So after that happened, you and Sara went

13  back to cleaning the room?

14          A.    Yeah, we finished cleaning.

15          Q.    Then what happened after that?

16          A.    I could not take any more.  I was so

17  depressed.  I was just like so disgusting feeling,

18  oh, God.  I just like, that's it.  I cannot take any

19  more.  I cannot stand and went home and cry, told my

20  friend, Luciana, told most of my friend.  My son I

21  told, my daughter.

22               I was just like so depressed.  I just --

23  I could not focus.  Every time I walk, sleep, it was

24  just keep coming.  I said, no, somebody has to stop

25  it.  It cannot continue like that.  So I just said,

# EXHIBIT "14"

57

Sara Daly

1  always and she was upset and I said, "What's going

2  on now?"

3              And she said, "That Shelby, she

4  touched me, I can't take it, I don't like to be

5  touched."

6      Q    Okay.

7      A    And it was the necklace that she had on.

8      Q    Okay.  So she told you about Miss Simmons

9  allegedly touching her.  Did she tell you that she

10 touched her or that she touched her necklace?

11     A    She said Shelby touched her chest.  And I

12 said, "What do you mean, chest?"

13             And she said, "She touched my

14 boobs."

15     Q    She said the word boobs?

16     A    Yes, she said, "She touched my boobs."

17             And I said, "Oh, no, she

18 didn't."  And then I went on after that, you know.

19     Q    So your reaction to that was you didn't

20 believe it?

21     A    Right, at the time I did not believe her

22 but she keep saying it, keep saying it over and

23 over.  You know, when we take the cigarette break,

24 then she bring it up again.

25             I said, "Well, go tell somebody,

# EXHIBIT "15"

59

Sara Daly

1 away.

2     Q    Did you witness the incident that she

3 said, in which she said to you -- did you see the

4 incident occur about the necklace?

5     A    No.  What happened was the incident had

6 already occurred when I walk in the door so I didn't

7 see it but the two of them were face to face and

8 Sabina was going off on Shelby.

9     Q    Okay.

10     A    And Shelby walk away, talking about "I, I

11 didn't mean no harm, what's wrong with her?"

12     Q    Okay.

13     A    That's it.

14     Q    Who else was present?

15     A    You know what?  That room was full of

16 everybody that day and I can't remember who else was

17 in that room.  Everybody was, we was getting ready

18 to go to work so just about who worked that day was

19 there.

20     Q    Okay.  Where did this incident take place?

21     A    It must have took place in front of the

22 door or either she walked to the door, but when I

23 walked in, her back was to me so that means that to

24 me it must have took place at the door near the

25 table where all the products and stuff at.

# EXHIBIT "16"

84

Sara Daly

1    Q    That would have been in 2000; is that

2  right?

3    A    2000 or 2001, yeah, I guess.

4    Q    Okay.  Okay.  Now -- that's fine.  I'm

5  going to attach this to the deposition as her

6  statement.  I guess that would be Plaintiff's

7  Exhibit 1.

8           (Marked for identification was Plaintiff's

9           Exhibit 1.)

10    Q    I wanted to ask you about the incident

11  where Miss Carey said that Miss Simmons grabbed her

12  breast.  Do you remember when that occurred, what

13  month that that would have occurred?  I believe you

14  said that you walked in right after this event

15  happened.

16    A    No.  Don't remember the dates.

17    Q    Okay.  Would it have been -- was it before

18  Miss Simmons made the comments about the room

19  smelling like a vagina?

20    A    Yes.

21    Q    Okay.  How far ahead do you think it might

22  have been, a few days, a month, couple months?

23    A    Maybe a few days, a week or whatever.

24    Q    And I believe you said that Miss Carey --

25  you walked in and Miss Carey was upset; is that

Sara Daly

1 right?

2      A      Um-hum, yes.

3      Q      And she was, was she crying or getting

4 ready, starting to cry, I believe you said?

5      A      She was there, she was getting ready to

6 cry, her face was red, she was upset.

7      Q      Okay.  And what did you hear Miss Carey

8 say as far as what Miss Simmons had done, what was

9 it that she was --

10     A      "She touched my boobs again."

11     Q      And then what did Miss Simmons say?  I

12 believe you said something like "I didn't mean no

13 harm" or something like that?

14     A      Well, she --

15            MS. HORNE:  Object to the form.

16     Q      You can go ahead and answer.

17            MS. HORNE:  You may answer.

18     A      Say it again, repeat the question.

19     Q      I believe you said earlier that Shelby

20 Simmons said, "I didn't mean no harm" after

21 Miss Carey said, "She touched my boobs;" is that

22 right?

23     A      Yes.

24            MS. HORNE:  Object to the form.

25     Q      Okay.  Now, do you think that the hotel

# EXHIBIT "17"

May 2000

In May 2000 I met with each housekeeper individually to ask them 3 questions:
1.  What do you like about your job?
2.  What do you dislike about your job?
3.  What would you change about your job?
I did this at this time because the unemployment rate was low and our hotel, along with others, were having a hard time hiring and keeping good housekeepers.  Each person was told that when I reported to the Housekeeping supervisors that no names or specifics would be used, only that we would discuss a summary of my questions.

I met with Sabina the last week in May.  In her answer to what she liked about the job she responded that she liked the work.  She liked Cynthia the Asst Hskpg Supv.

In answering what she did not like about the job, she said she felt the housekeepers were talked down to by the supervisors in the way they were corrected, that they were made to feel less important and in her opinion they were not spoken to a manner that made them feel respected.  She said she felt nagged all the time because she was slower.  She also said that Shelby touched her on occasions like a hug or touching her arm or her back.  She asked that I tell Shelby not to touch her.

The following day I completed the rest of the interviews with the housekeepers.


June 2, 2000.  I compiled a list which was a summary of all the responses.  Shelby and I met for approx. two hours in her office and discussed the responses.  A lot of the responses we discussed where consistent from all the hskpg staff.  It included rotating weekends, schedule requests, talking about housekeepers to other housekeepers, correcting them or scolding them publicly, in front of other staff members/guest, being more available, lack of positive feedback, the same ladies always needing help, breaking down sections better.  We also discussed what is appropriate and inappropriate things to say to staff.  For example, telling a housekeeper they have a big butt.  We discussed in detail avoiding girl talk, discussing a housekeepers issues in public areas where others can hear, we discussed appropriate and inappropriate topics such as race, religion, etc.  I also told her to refrain from touching the housekeepers, whether it be a pat on the back, touching their hand and arms for whatever occasion, etc..  I also requested that she have no non hotel related business with any of her staff members.  One housekeeper had mentioned she ordered Home Interior for her and she paid her money and it took forever to get it.  I told Shelby to avoid any situations like this, whether it be Avon, Home Interior, or Girl Scout Cookies as all in house solicitation must have my prior approval.


Cheryl Q. Reseck

# EXHIBIT "18"

Sara Daly

1  management knew how Miss Simmons was acting in the

2  workplace?

3      A     I don't think so.

4      Q     You don't think they knew?

5      A     No, I don't think so.  If nobody tell, how

6  would you know?

7      Q     Did people talk about it there at the

8  office or at work, your coworkers?

9      A     Yeah, they talked, they say things.

10     Q     And was Miss Simmons' conduct going on the

11  whole time you worked there as far as, you know,

12  touching people, hitting them on the butt and those

13  types of things?

14     A     Well, like I said, that's her, she does

15  things like that, that's the way she communicated, I

16  guess.

17     Q     And she did that the whole time you were

18  there; is that right?

19     A     She didn't do it like every day you walk

20  in there she touching people, no, no, but she did

21  it --

22     Q     Throughout the whole time.  All right.

23  Now, management's supposed to keep up with what's

24  going on there at the hotel; right?

25              MS. HORNE:  Object to the form.

# EXHIBIT "19"

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1          A.    I don't know.

2                MR. MURRELL:   I object to the question.

3                THE WITNESS:   I don't know.

4    BY MR. COLEMAN:

5          Q.    Okay.  And your testimony is that after

6    she touched you, you told her not to touch you again;

7    is that right?

8          A.    Yes.

9          Q.    Did she say anything else to you?

10         A.    She giggled.

11         Q.    I'm sorry?

12         A.    She giggled.

13         Q.    She giggled?

14         A.    Yeah.

15         Q.    Did she say anything to you?

16         A.    I don't know.  I was so shock and feeling

17   embarrassed and feeling like strip my dignity.  I

18   feeling nothing.

19         Q.    And that happened in May, right?

20         A.    Uh-huh.

21         Q.    All right.  What did you do after that

22   incident happened?

23         A.    Feel this letter, I think, because I was

24   so hurt.  I pass by downstairs and see Shelby --

25   Shirley --

64

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1    us, I was putting things together, and this time she

2    was with Cynthia.  With Cindy, not Cynthia, Cindy.  I

3    had a domin -- this in my neck (Indicating), and

4    Cindy, said, oh, it's a nice charm you have, and she

5    look at, and I said, yes, it's three color; it is

6    nice.

7              As I was showed her, Shelby grab my

8    breast, and, again, I said, don't ever touch me,

9    please.  Don't touch me.  And she said, you didn't

10   have big boobs, anyway.  And that -- again, it hurt

11   me, and I started to just crying.  Working -- I had

12   to work and cry feeling almost -- she killed my

13   spirit.  She stripped my dignity that day.  I feel

14   again worse than the first time.

15        Q.    Okay.  When she grabbed -- when she

16   allegedly grabbed your breast, did you say anything

17   to her?

18        A.    I said, don't touch me.

19        Q.    And how did she respond to you?

20        A.    The same thing, the giggling.

21        Q.    Okay.  She was giggling?

22        A.    You don't have no big boobs, anyway, she

23   said.

24        Q.    Did you think that maybe she touched your

25   breast accidentally?

67

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1                    MR. MURRELL:  Objection.  Go ahead and

2     answer.

3                    THE WITNESS:  Huh?

4                    MR. MURRELL:  Go ahead and answer.

5                    THE WITNESS:  Yeah.  I don't wait months.

6     BY MR. COLEMAN:

7          Q.    That's not possible?

8          A.    No.  I just hold it for a few days

9     because it shock me, my body.  I cry.  It's painful

10    for me, as I said, strip my dignity.

11         Q.    Okay.  When you say that Ms. Simmons

12    touched your breast, how did she do so?  Did she just

13    touch it, or what did she do?

14         A.    She grab it.

15         Q.    She actually grabbed it?

16         A.    Yeah.  She said, you don't have big

17    boobs, anyway.

18         Q.    And do you have an opinion as to why she

19    allegedly grabbed your breast?

20                    MR. MURRELL:  Objection.

21                    THE WITNESS:  I don't have no opinion

22    for -- I speak for me.

23    BY MR. COLEMAN:

24         Q.    You have no opinion?

25         A.    I don't have opinion what you think about

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1    said, you cannot joke.  Just come on and give me a

2    hug.  I said, no, you stay away from me; stay away

3    from me.

4         Q.    And how did she respond to you after

5    that?  Was she laughing again?  Was she giggling?

6         A.    I don't know.  I stay away in the hall

7    until she will leave.

8         Q.    Did she leave?

9         A.    I guess so because I didn't hear her

10   voice anymore.  So Sara and I, we start clean the

11   room.

12        Q.    So after that happened, you and Sara went

13   back to cleaning the room?

14        A.    Yeah, we finished cleaning.

15        Q.    Then what happened after that?

16        A.    I could not take any more.  I was so

17   depressed.  I was just like so disgusting feeling,

18   oh, God.  I just like, that's it.  I cannot take any

19   more.  I cannot stand and went home and cry, told my

20   friend, Luciana, told most of my friend.  My son I

21   told, my daughter.

22             I was just like so depressed.  I just --

23   I could not focus.  Every time I walk, sleep, it was

24   just keep coming.  I said, no, somebody has to stop

25   it.  It cannot continue like that.  So I just said,

72

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1    well, I better do something because that's it.  I

2    cannot take any more.

3          Q.    So what did you do?

4          A.    Twice didn't stop.  The third time I have

5    to stop.  So I called Cheryl.

6          Q.    Cheryl Reseck?

7          A.    Yeah, from my house.  And I said, when

8    the owner is coming?  They were in London.  She said,

9    in a week, two weeks.  Why?  And I told her.  So they

10   had to -- a week later, I guess, the wife came.  They

11   called me from work to explain that -- exactly what

12   happened, you know.  They told us exactly what

13   happened.  So I did.

14         Q.    After you called Ms. Reseck, did you go

15   back to work?

16         A.    I had to.

17         Q.    You had to?

18         A.    Yeah.  It was in the schedule.

19         Q.    And how many days did you work?

20         A.    I believe like maybe two weeks more so,

21   two or three.  I don't remember exactly.

22         Q.    During that two or three weeks, during

23   those two or three weeks, you weren't working with

24   Ms. Simmons, were you?

25         A.    I don't remember.

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1    me see that or I want to see the charm or anything?

2         A.    No.

3         Q.    So it's your testimony that you're

4    standing there, Cindy is holding your charm looking

5    at it, and Shelby just reached in and grabbed your

6    breast?

7         A.    Yeah.

8         Q.    And that's what happened?

9         A.    Yeah.  And she said -- I said to her,

10   don't touch me.  Don't ever touch me, never.  Nobody

11   touch me.  So she grabbed my -- when she grabbed my

12   breast, it just upset me.  I could not even focus to

13   the job.

14        Q.    And then you went --

15        A.    I cry.

16        Q.    Did you cry?

17        A.    Yes, of course I cry.

18        Q.    At the time?

19        A.    Yes.  It upset me so terrible, yes.

20        Q.    Who saw you crying?

21        A.    I'm in my room crying by myself for what

22   it hurt me.

23        Q.    Okay.  Did anybody see you crying?

24        A.    I work in my room by myself.

25        Q.    So the answer to my question is no?

133

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1          A.    I believe eight.  Don't ask me because I
2     work on the week -- on Sunday they pay you more.
3          Q.    Tell me, if you would, how you've been
4     damaged by what allegedly happened at the Holiday Inn
5     Express.  What are your damages?
6          A.    Mental.
7          Q.    I'm sorry?
8          A.    Mental.
9          Q.    Mental?
10         A.    Yes.
11         Q.    Okay.  And what else?
12         A.    Emotionally crying because I keep
13    thinking, and I really need somebody to talk, some
14    more professionally to make me feel -- to calm down
15    because I wasn't thinking, and I didn't want nobody
16    to stay close to me because I have to keep myself in
17    guard and it would not happen again.
18         Q.    Let me ask you this:  You quit working at
19    the Holiday Inn Express and you worked at Carolina
20    Flags for one month.
21         A.    Yes.
22         Q.    So one month after you quit working for
23    the Holiday Inn Express you went to work for
24    Wal-Mart, correct?
25         A.    Yeah.

# EXHIBIT "20"

Sara Daly

1  elevator so then she came back to the room.

2       Q    So how long was she -- did she leave the

3  room?

4       A    Maybe five minutes, ten minutes, something

5  like that, she didn't stay that long, 'cause this

6  happened real quick.

7       Q    Okay.  And when she came back to the room

8  was she crying?

9       A    Um-hum.

10      Q    She was?

11      A    Um-hum.

12      Q    Was she able to perform her job duties?

13      A    Yes, she did, 'cause I started talking to

14 her.

15      Q    Okay.  Were you upset?

16      A    Things like that don't upset me, no, she

17 did nothing to me, fine with me.  I mean, she

18 shouldn't have said it, but the way she said it, I

19 don't think she was thinking that she was giving

20 Sabina -- you know, hurting Sabina' feelings at the

21 time, I don't think so.  But that's Shelby, Shelby

22 act like that.

23      Q    So you don't think that Shelby intended to

24 hurt Sabina's feelings --

25      A    No.

56

Sara Daly

1    A     Right.

2    Q     Okay.  And do you smoke?

3    A     Yes.

4    Q     And does Miss Carey smoke?

5    A     No.

6    Q     She doesn't?

7    A     I don't remember seeing her, I can't

8    remember if she smoke or not.  I can't remember

9    that, I'll think about it while you're talking but I

10   can't remember, I don't think she smoked.

11   Q     Okay.  Well, let me ask you this question:

12   Did you and Miss Carey take smoke breaks together?

13   A     Yeah.

14   Q     Okay.  Now, does Miss Carey smoke?

15   A     Yeah, she does, I remember now, she gave

16   me a cigarette.

17   Q     Okay.

18   A     Yes, she does.

19   Q     And so you guys would take smoke breaks

20   together?

21   A     Um-hum.

22   Q     And did she talk to you about Ms. Simmons

23   touching her in an inappropriate manner?

24   A     Yes, but she talked to me before then

25   'cause one morning when I came in to work late as

57

Sara Daly

1  always and she was upset and I said, "What's going

2  on now?"

3                      And she said, "That Shelby, she

4  touched me, I can't take it, I don't like to be

5  touched."

6      Q    Okay.

7      A    And it was the necklace that she had on.

8      Q    Okay.  So she told you about Miss Simmons

9  allegedly touching her.  Did she tell you that she

10  touched her or that she touched her necklace?

11      A    She said Shelby touched her chest.  And I

12  said, "What do you mean, chest?"

13                      And she said, "She touched my

14  boobs."

15      Q    She said the word boobs?

16      A    Yes, she said, "She touched my boobs."

17                      And I said, "Oh, no, she

18  didn't."  And then I went on after that, you know.

19      Q    So your reaction to that was you didn't

20  believe it?

21      A    Right, at the time I did not believe her

22  but she keep saying it, keep saying it over and

23  over.  You know, when we take the cigarette break,

24  then she bring it up again.

25                      I said, "Well, go tell somebody,

Sara Daly

1  right?

2      A    Um-hum, yes.

3      Q    And she was, was she crying or getting

4  ready, starting to cry, I believe you said?

5      A    She was there, she was getting ready to

6  cry, her face was red, she was upset.

7      Q    Okay.  And what did you hear Miss Carey

8  say as far as what Miss Simmons had done, what was

9  it that she was --

10     A    "She touched my boobs again."

11     Q    And then what did Miss Simmons say?  I

12  believe you said something like "I didn't mean no

13  harm" or something like that?

14     A    Well, she --

15          MS. HORNE:  Object to the form.

16     Q    You can go ahead and answer.

17          MS. HORNE:  You may answer.

18     A    Say it again, repeat the question.

19     Q    I believe you said earlier that Shelby

20  Simmons said, "I didn't mean no harm" after

21  Miss Carey said, "She touched my boobs;" is that

22  right?

23     A    Yes.

24          MS. HORNE:  Object to the form.

25     Q    Okay.  Now, do you think that the hotel

# EXHIBIT "21"

62

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1      Q.    Cheryl Reseck?

2      A.    Yeah, the general manager.  I said, look,

3   she touch me.  She said, okay.  I thought she will

4   take care of it.  So I made it no big deal.  I said,

5   well, I guess she talked to her and that's it.

6      Q.    Okay.

7      A.    So I just let her go because I report it.

8      Q.    And do you know whether or not

9   Ms. Reseck, you know, took care of things?

10     A.    I don't know.  She said okay, you know.

11  When I said okay, I think she will take care.

12     Q.    So you don't know what happened after

13  that?

14     A.    No.

15     Q.    And you said that that conversation with

16  Ms. Reseck occurred several days later?

17     A.    Yeah, a few days later because I had to

18  just like -- I was so hurt for what happened.  I had

19  to come down and report it, and I said, oh, by the

20  way, you know, she touch -- grabbed my butt, and she

21  said, okay.  You know, when she said okay, I thought

22  she will take care.

23     Q.    Okay.  Did you work -- do you remember

24  whether or not you worked the rest of the day after

25  Ms. Simmons allegedly touched you?

# EXHIBIT "22"

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1    her.  I'm talking about myself, my body.

2        Q.    So you can't say why she did it?

3        A.    I don't know.

4        Q.    So you can't say why she did it, and you

5    don't have an opinion as to why she did it; is that

6    correct?

7        A.    I don't know.

8        Q.    So the answer to my question is yes?

9        A.    Yeah.

10       Q.    Okay.  So she allegedly touched your

11   behind in May.  She allegedly -- and was giggling

12   when she did it.  She allegedly touched your breast

13   in June and she was giggling when she did it, and

14   then what happened after that?

15       A.    I report it to Cheryl.

16       Q.    The same day or a couple of days again?

17       A.    A few days.

18       Q.    Okay.

19       A.    And she said, again, okay, you know.  And

20   I just believe that she will take care of it.  So I

21   had to continue to work.

22       Q.    And did you work those days between when

23   it allegedly happened and when you told Ms. Reseck?

24       A.    As I said, I don't know my schedule.  I

25   cannot say exactly did I work it.

62

Sara Daly

1  to him.

2      Q      Okay.  And do you know whether she went to

3  Cheryl or went to Mr. Thaker about that?

4      A      I don't know, I know one day she was in

5  the office but I don't know what she was there for,

6  I didn't ask her.

7      Q      Did she ever tell you that she told

8  Miss Reseck about that incident?

9      A      She did tell me one time, she called me

10  and told me this on the phone.  And I said, "Well, I

11  got somebody on long distance and I'll call you

12  back."

13      Q      When did she call you on the phone?

14      A      I don't remember, that was a long time,

15  but she did call me and tell me that, she said, "I

16  am tired of this, I am going to talk to someone for

17  my rights 'cause this is sexual harassment."

18                          And I said, "Well, what's Cheryl

19  say?"

20                          And she said, "I'm just tired,

21  I'm just tired telling them and they not doing

22  anything."

23                          I said, "Well, let me tell you,

24  you can't fire somebody just like that, you got to

25  wait, and what they might be doing is checking her

# EXHIBIT "23"

72

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1    well, I better do something because that's it.    I

2    cannot take any more.

3            Q.    So what did you do?

4            A.    Twice didn't stop.    The third time I have

5    to stop.    So I called Cheryl.

6            Q.    Cheryl Reseck?

7            A.    Yeah, from my house.    And I said, when

8    the owner is coming?    They were in London.    She said,

9    in a week, two weeks.    Why?    And I told her.    So they

10   had to -- a week later, I guess, the wife came.    They

11   called me from work to explain that -- exactly what

12   happened, you know.    They told us exactly what

13   happened.    So I did.

14           Q.    After you called Ms. Reseck, did you go

15   back to work?

16           A.    I had to.

17           Q.    You had to?

18           A.    Yeah.    It was in the schedule.

19           Q.    And how many days did you work?

20           A.    I believe like maybe two weeks more so,

21   two or three.    I don't remember exactly.

22           Q.    During that two or three weeks, during

23   those two or three weeks, you weren't working with

24   Ms. Simmons, were you?

25           A.    I don't remember.

71

Sara Daly

1    Q    Okay.  Did Miss Carey at some point ask

2  you or tell you that she was going to sue the hotel?

3    A    She said she was going to sue Shelby, "I'm

4  going to take a lawsuit out on Shelby."  But then, I

5  don't know, you know, she might have tell me that

6  too 'cause, she'd say, "I'm going to do something

7  about" -- I'm trying to recollect what she's saying,

8  this is the way I remember.

9              She said something about "I'm

10  going take a lawsuit out on Shelby, I'm going to

11  find me a lawyer, I've talked to a lawyer,"

12  something, she said, and that it's sexual

13  harassment.

14              I said, "Well, yeah, it is."

15              And "I'm going to sue Shelby and

16  if" -- I got it, "and if they'll do nothing to

17  Shelby I'm going to sue the hotel," that's what she

18  said.

19    Q    That's what she said to you?

20    A    Yes.

21    Q    So she said this before Shelby was

22  suspended?

23    A    Yeah, this happened before, yeah.

24    Q    Okay.

25    A    I said, "Well, talk to, go talk to

87

Sara Daly

1      A      Yeah, yes.

2      Q      Okay.  You know, things are going on like

3  that, they should know about it?

4      A      But if nobody tells it, how would you

5  know?

6      Q      Okay, I understand.

7      A      Okay.

8      Q      Now, Miss Carey said she did tell them

9  though; right?

10     A      Yeah.

11     Q      And did you see management do anything

12 after Miss Carey told you she had told the

13 management about her problems with Miss Carey -- I

14 mean, Miss Simmons, did you see management doing

15 anything, changing anything?

16     A      Well, I don't -- it wasn't me and I wasn't

17 keeping up with nothing, as long as they ain't

18 touching me, bothering me, that's it, so.

19     Q      Okay.  Now, when Miss Carey told you that

20 she had complained about Miss Simmons harassing her,

21 did Miss Simmons continue to work at the hotel after

22 that time?

23     A      Yeah, she was still working.

24     Q      And did Miss Simmons try to touch you in

25 any sexual or inappropriate way?

# EXHIBIT "24"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

SABINA CAREY,                               )        CASE NO. 2-01-2612-18RB
                                            )
              Plaintiff,                    )
                                            )
     vs.                                    )        **DEFENDANT ABC HOSPITALITY, LLC'S**
                                            )        **RESPONSES TO PLAINTIFF'S**
ABC HOSPITALITY, LLC                        )        **REQUEST FOR ADMISSION**
and SHELBY SIMMONS,                         )
                                            )
              Defendants.                   )
_____)

TO:    J. DAVID MURRELL, ESQUIRE, ATTORNEY FOR THE PLAINTIFF

       Defendant ABC Hospitality, LLC ("ABC"), without admitting the existence of, and expressly

reserving its right to challenge, jurisdiction in this case, responds to Plaintiff's Request for

Admission as follows:

### GENERAL OBJECTION

       ABC objects to these Requests to the extent they are considered by Plaintiff to have been

served on any date prior to August 6, 2001, on the grounds that they were untimely served in

violation of Rule 26(d) of the Federal Rules of Civil Procedure.

### RESPONSES

       **1.     Admit that Defendant Simmons sexually harassed and assaulted the Plaintiff.**

**RESPONSE:**  ABC objects to this Request on the grounds that it seeks an admission concerning a
matter of law, opinion of law, or a matter otherwise inappropriate for a Request for
Admission. To the extent a response is required, the Request as written is denied.

       **2.     Admit that the Plaintiff reported Defendant Simmons' harassment and assault**

**to her supervisors.**

**RESPONSE:**  ABC objects to this Request on the grounds that it seeks an admission concerning a
matter of law, opinion of law, or a matter otherwise inappropriate for a Request for
Admission. To the extent a response is required, the Request as written is denied.

3.    **Admit Defendant Holiday Inn failed to ensure Defendant Simmons did not continue her harassment and assault to the Plaintiff.**

**RESPONSE:** ABC objects to this Request on the grounds that it seeks an admission concerning a matter of law, opinion of law, or a matter otherwise inappropriate for a Request for Admission. To the extent a response is required, the Request is denied.

4.    **Admit other employees at Defendant Holiday Inn have reported Defendant Simmons' harassment to their supervisors.**

**RESPONSE:** ABC objects to this Request on the grounds that it seeks an admission concerning a matter of law, opinion of law, or a matter otherwise inappropriate for a Request for Admission. To the extent a response is required, the Request is denied.

5.    **Admit that Plaintiff resigned from her employment due to the fact that she was emotionally incapable of handling any more of Defendant Simmons' harassment and assault.**

**RESPONSE:** ABC objects to this Request on the grounds that it seeks an admission concerning a matter of law, opinion of law, or a matter otherwise inappropriate for a Request for Admission. To the extent a response is required, the Request as written is denied.

Respectfully submitted,

J. Walker Coleman, IV (Fed. ID# 6007)
Jenny A. Horne (Fed. ID# 7048)
NEXSEN PRUET JACOBS POLLARD & ROBINSON, LLC
200 Meeting Street, Suite 301
Post Office Box 486
Charleston, South Carolina  29402
(843) 577-9440

**ATTORNEYS FOR DEFENDANT
ABC HOSPITALITY, LLC**

Charleston, South Carolina

August 20, 2001

NPCHAR1:167780.1-RQ-(JWC) 029320-00002

# EXHIBIT "25"

CHERYL QUAST RESECK - EX. BY MR. MURRELL

1    BY MR. MURRELL:

2        Q.    If the hotel told me that Sabina Carey

3    did not report the sexual harassment by Shelby

4    Simmons, if they did that, is that correct or is that

5    incorrect?

6            MS. HORNE:   Object to the form.

7            THE WITNESS:   The hotel never said it was

8    not reported.

9    BY MR. MURRELL:

10       Q.    You're not listening to me, ma'am.   We're

11   going to be here very --

12       A.    Is this a hypothetical situation you're

13   asking me about?

14       Q.    I'm asking you a question.   Now, listen

15   to me.   We're going to be here a real long time if

16   you continue to avoid giving me an answer.   Okay?

17           MS. HORNE:   David, I'm going to instruct

18   you to stop badgering my witness.

19   BY MR. MURRELL:

20       Q.    If the hotel said Sabina Carey did not

21   report the sexual harassment to her supervisors, is

22   that true or is that false?

23           MS. HORNE:   Object to the form.

24           THE WITNESS:   If the hotel would have

25   said to said that, to say that, which we did not, but

A. WILLIAM ROBERTS, JR., & ASSOCIATES

CHERYL QUAST RESECK - EX. BY MR. MURRELL

1    if we did say that, it would be incorrect.

2    BY MR. MURRELL:

3        Q.    Okay.  Thank you.

4        A.    But the hotel did not say that.

5        Q.    All right.  That's fine.  It's just

6    simple straightforward questions.  Okay?  I'm not

7    trying to trick you.

8              Now, is it acceptable behavior at Holiday

9    Inn Express for an employee to use the word vagina in

10   front of other employees?

11       A.    It's not professional behavior, but it's

12   a proper word.  It's not professional.

13       Q.    Is it --

14       A.    We don't have a rule against using the

15   word vagina.

16       Q.    Is it acceptable or unacceptable?

17       A.    It's unprofessional.

18       Q.    I understand that's what you're saying.

19   But between it being acceptable and being

20   unacceptable, which is it?

21       A.    I would think from a supervisor and

22   manager, it would be unacceptable.

23       Q.    Okay.  Did you speak with anybody at the

24   South Carolina Human Affairs Commission about

25   Ms. Carey's complaint of sexual harassment?

# EXHIBIT "26"

CHERYL QUAST RESECK - EX. BY MR. MURRELL

1    that was my second incident.

2          And the third incident that I

3    investigated, Sabina had told me that Sara Daly was

4    in the room with her and that Niyokia Guisburg was in

5    the hallway and that both of them were witnesses to

6    Shelby coming in and using the word vagina.

7          I spoke to Niyokia Guisburg who said that

8    she was several doors -- several rooms down the hall

9    and that she did not hear anything, but she saw --

10   she saw like some excitement down there is how I

11   would describe it.  And she said that she -- like I

12   said, did not hear anything.  And I spoke to Sara

13   Daly, and Sara confirmed that Shelby did use the word

14   vagina.

15         So out of the three incidents, I had one

16   corroborated incident of inappropriate language, and

17   I forwarded that to Mr. Thaker.  And based on the

18   incident of inappropriate language, it was determined

19   to terminate her.

20         I had met with -- Sabina did come in and

21   talk to Ms. Thaker and I and described -- and this

22   might have been the following day, August 9th --

23   described again the situations to us so we could ask

24   more questions and ask for more detail.

25         Ms. Thaker and I again met with Sabina

60

CHERYL QUAST RESECK - EX. BY MR. MURRELL

1    objected to the Interrogatory, that it was vague and

2    overly broad; but without waiving that objection, the

3    hotel answered this way.  And I want you to read what

4    it says there starting with:  Ms. Reseck.

5         A.    Ms. Reseck immediately investigated

6    Plaintiff's complaints about Defendant Simmons by

7    questioning Ms. Simmons, the individuals Plaintiff

8    informed Ms. Reseck witnessed the alleged incidents

9    of sexual harassment, and the other members of the

10   housekeeping staff.  Although Plaintiff's specific

11   allegations were not corroborated, the investigation

12   did reveal that Defendant Simmons occasionally used

13   inappropriate language.  Consequently, out of the

14   abundance of caution, ABC took prompt remedial action

15   and terminated Ms. Simmons.

16        Q.    Now, that says her complaints were not

17   corroborated; is that right?

18        A.    That's what it says.

19        Q.    Is that correct?

20        A.    Two of the complaints were not

21   corroborated.

22        Q.    So is that correct or not correct?

23        A.    It's not correct, then, if two of the

24   complaints were not corroborated and one was.

25        Q.    Okay.

# EXHIBIT "27"

CHERYL QUAST RESECK - EX. BY MR. MURRELL

1      A.   I believe.

2      Q.   Okay.  So the manager over at Holiday Inn

3   Mt. Pleasant said he found out that Shelby Simmons

4   was fired from your hotel from Jewel Oxner?

5      A.   Possibly.

6      Q.   What did you tell him about the sexual

7   harassment?  Did he ask you your opinion of it or

8   what did you find or ask you any questions?

9      A.   When he called me, he asked me

10   quality-of-work questions.

11      Q.   And that was it?

12      A.   That was it.

13      Q.   Have you had other complaints regarding

14   Shelby Simmons while she was employed with your

15   hotel?

16      A.   No.

17      Q.   Have you ever had a complaint from a

18   customer or a guest at the hotel about any sexual

19   harassment?

20      A.   No.

21      Q.   Any complaints from a guest or a customer

22   about Shelby Simmons?

23      A.   No.

24      Q.   Did you have any problems with Shelby

25   Simmons while she worked for you?

A. WILLIAM ROBERTS, JR., & ASSOCIATES

# EXHIBIT "28"

CHERYL QUAST RESECK - EX. BY MR. MURRELL

1    marriage?

2         A.    No.

3         Q.    Have you ever been arrested?

4         A.    No.

5         Q.    Tell me, what is the policy -- or what

6    was the policy in the year 2000 for the Holiday Inn

7    Express regarding sexual harassment?

8         A.    No type of harassment would be tolerated,

9    whether it be sexual, racial, religious.  No type of

10   harassment was tolerated.  It was listed in our hotel

11   rules.

12        Q.    What was the procedure that an employee

13   was to follow if they had a sexual harassment

14   complaint?

15        A.    It would have been the same as any

16   complaint.  They would have come to me, made their

17   complaint.  It would have been investigated.

18        Q.    Okay.

19        A.    I don't -- that's our standard procedure.

20   I've always been accessible to my employees.  I sit

21   in on at least a portion of every interview.  I give

22   the final yea or nay for hiring.  At that time, I let

23   them know hotel benefits and that I'm the go-to

24   person.

25        Q.    Okay.

15

CHERYL QUAST RESECK - EX. BY MR. MURRELL

1          A.    And that my door is always open.

2          Q.    All right.  Does Holiday Inn -- Holiday

3    Inn Express in 2000, did they have a written policy

4    for sexual harassment?

5          A.    It was in our hotel rules.  No harassment

6    was tolerated, whether it be religious, sexual,

7    racial.  I don't remember all the wording on it, but,

8    yes, we did have a harassment policy.

9          Q.    Okay.

10          A.    Zero tolerance.

11          Q.    That sounds like a statement, you know,

12    just saying you don't allow any of that.  But what

13    was the actual steps that should be taken by an

14    employee?

15          A.    It would have been the same as any other

16    complaint, bring it to me.

17          Q.    Did the hotel back in 2000 have a written

18    policy on what was to happen if someone was claiming

19    sexual harassment?

20          A.    No.  It would have been the same as our

21    standard complaint policy, just bring it to me.

22          Q.    What is the standard complaint policy?

23    Is there a written policy about that?

24          A.    No, but everybody -- it was never any

25    question.  And, trust me, I get complaints all the

A. WILLIAM ROBERTS, JR., & ASSOCIATES

16

CHERYL QUAST RESECK - EX. BY MR. MURRELL

1    time.  And I frequently walk the floors, ask the

2    staff members what we're doing good, what we're doing

3    bad, any problems.

4           I don't think I've ever had an employee

5    that failed to complain to me, including Ms. Carey

6    who complained not really on a regular basis, but she

7    didn't have a problem bringing problems to me.

8           Q.   Now, what sort of reports were you to

9    fill out when somebody made a sexual harassment

10   claim?

11          A.   I didn't have reports.  It would have

12   been treated like any other complaint.  I would have

13   listened to it, it would have been investigated, and

14   a determination would have been made.

15          Q.   Did y'all have a form for complaints --

16          A.   No.

17          Q.   -- that you filled out?

18          A.   No.  It would have been treated like any

19   other complaint.

20          Q.   Did you keep any records regarding sexual

21   harassment claims?

22          A.   We didn't have any claims.  So I wouldn't

23   have had any records.

24          Q.   You had a claim by Ms. Carey.

25          A.   Prior to this one, we didn't have any

A. WILLIAM ROBERTS, JR., & ASSOCIATES

# EXHIBIT "29"

172

CHERYL QUAST RESECK - EX. BY MR. MURRELL

```
 1      May, right?

 2              A.    I'm sorry?

 3                    MS. HORNE:   Object to the form.

 4      BY MR. MURRELL:

 5              Q.    It would have been three months from May

 6      that you met with Shelby Simmons; is that right?

 7              A.    What do you mean three months from May?

 8              Q.    August is three months from May, right?

 9              A.    I didn't discuss sexual harassment with

10      her in May.

11              Q.    Okay.  I'm not asking you that.

12              A.    Well, then, ask me the question again.

13              Q.    My question is:  When you met with

14      Ms. Simmons, you said that you felt like it was in

15      August of 2000, possibly August the 8th of 2000; is

16      that correct?

17              A.    When I met with her for the first time

18      after the allegations were made is when -- it was

19      either the 8th, or if she wasn't working the 8th, it

20      was the 9th.

21              Q.    Of 2000, right?

22              A.    Right.

23              Q.    And that would have been three months

24      after May of 2000, right?

25              A.    Yeah.
```

# EXHIBIT "30"

174

CHERYL QUAST RESECK - EX. BY MR. MURRELL

1       A.    No, not at that time.

2       Q.    Has anybody ever told you anything

3   negative about Ms. Simmons before you hired her?

4       A.    No.

5       Q.    Who did you speak to about Ms. Simmons

6   before you hired her?

7       A.    I checked references that were on her

8   resume.  I don't remember names or who it was.  I

9   believe I spoke to the general manager at the Hampton

10  Inn and maybe a lady from the Embassy.

11      Q.    I'm sorry.  What was that last one?

12      A.    Maybe someone from the Embassy.

13      Q.    Embassy Suites?

14      A.    Uh-huh.

15      Q.    Did Sabina Carey report to you that

16  Shelby Simmons grabbed her butt?

17      A.    Yes.

18      Q.    Did Sabina Carey report to you that

19  Shelby Simmons grabbed her breast?

20      A.    After she told me she was suing the hotel

21  for sexual harassment, but, yes, it was reported.

22      Q.    Did she tell you that Shelby Simmons made

23  a comment of -- about a room smelling like a vagina?

24      A.    At the same time she told me that her

25  breast was grabbed, it was reported.

CHERYL QUAST RESECK - EX. BY MR. MURRELL

1          Q.    Okay.  What did you do after Sabina Carey

2    reported that Shelby Simmons grabbed her butt?

3          A.    I checked into it, and I investigated it.

4          Q.    What did you tell Ms. Carey?

5          A.    I don't believe I followed up with

6    Ms. Carey.  Again, the way that Ms. Carey reported it

7    to me was in passing in a hallway.  As she's walking

8    one direction and I'm walking another direction, she

9    said, Shelby grabbed my butt.

10          I asked if anybody witnessed it.  She

11   said, Cynthia.  And she kept going, and I kept going.

12   And I -- I still took it as serious, but I guess just

13   because, you know, it wasn't -- you know, she wasn't

14   emotionally tormented from the way that she reported

15   it, just happened -- I felt like had I not passed her

16   in the hallway, she may have not told me.

17          But without that -- it didn't matter.  I

18   still -- I investigated it.  It was still a

19   complaint.  I spoke with Cynthia McKnight and

20   questioned her about the incident, and she said it

21   never happened.  She never saw Shelby touch Sabina,

22   and I questioned Shelby.

23          Q.    But you never told Sabina Carey anything

24   about it after that time that she reported it to you;

25   is that right?

# EXHIBIT "31"

100

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1      A.    Yeah.

2            (DFT. ABC EXH. 8, One-page drawing, was

3            marked for identification.)

4    BY MR. COLEMAN:

5            Q.    Do you recall, Ms. Carey, meeting with

6    Ms. Reseck during the last week of May to discuss

7    just in general your job, what you liked about it,

8    what you didn't like about it, what you thought ought

9    to be changed about your job?

10           A.    I don't remember.

11           Q.    You don't remember if you did, or you

12   don't remember --

13           A.    I don't remember if I did.

14           Q.    Okay.  Did you ever feel like -- scratch

15   that.

16                 So is it your testimony today that you

17   have no knowledge about Ms. Simmons being placed on

18   suspension?

19           A.    I didn't know.  Nobody told me that.

20           Q.    Did you know that Ms. Simmons was

21   ultimately terminated?

22           A.    No, I didn't know.

23           Q.    Did you wonder why -- after you made your

24   last complaint about the use of the word vagina, did

25   you wonder why you didn't see her around?

# EXHIBIT "32"

Cynthia McKnight

1     A     I don't remember the date she did that, I

2  know she did it that Wednesday or that Thursday she

3  did that but Shelby had already left, wasn't there.

4     Q     Now, she was just suspended at that time

5  or had they already fired her?

6     A     No, they suspended her.

7     Q     And they didn't tell Miss Carey that she

8  was suspended?

9     A     No.  Didn't even let nobody know about

10 that.

11    Q     Okay.  Now, let me make sure that I

12 understand, did all this happen in the same day?

13 Did Miss Reseck come to you and ask you, had you

14 seen Miss Simmons touch anybody or Sabina Carey and

15 suspend Shelby all at the same day?

16    A     No.

17    Q     Okay.  When did she come to you or, and

18 ask you about whether you saw her touch anybody, was

19 that a few days earlier or was that later or?

20    A     She came to me that Monday and asked me

21 about Sabina, asked me about if I seen Shelby touch

22 any of the employee, that was a Monday morning when

23 I came back to work.

24    Q     Okay.

25    A     And I think it was that Thursday or that

Carolina Reporting (843)832-0801

# EXHIBIT "33"

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1        A.    Well, some time they travel for the

2   business or they are sick.  I don't really understand

3   why.

4        Q.    Other than the alleged breast touching

5   and the alleged butt touching and the alleged use of

6   the word vagina, are there any other incidents that

7   occurred while you worked at the Holiday Inn?

8        A.    No.  I don't remember, no.

9        Q.    Okay.

10        A.    I don't remember others.

11        Q.    That's all?

12        A.    I think so.

13        Q.    Do you recall how many days you actually

14   worked after you reported the use of the term vagina

15   until you quit?

16        A.    In between the 15th, 16th, or 18th,

17   something like that.  I really cannot remember when.

18        Q.    So --

19        A.    15th.

20        Q.    Does it sound accurate that you worked

21   for probably about three weeks before you quit, after

22   you made the phone call to Ms. Reseck?

23        A.    Yeah.  That's what I believe.

24        Q.    Okay.

25        A.    I try to stop then, but anybody make a

102

SABINA HAGOSA CAREY - EX. BY MR. COLEMAN

1    mistake.  I must make a mistake, but I know I was

2    looking for better job.

3         Q.    Why did you quit?

4         A.    Because I like to have a better job, as I

5    told you, for everything, security and protection.

6         Q.    What do you mean protection?

7         A.    To not have a touch anymore or

8    harassment, body, whatever.

9         Q.    Why did you feel that you were not safe

10   if after you -- you know, you reported to Ms. Reseck

11   Ms. Simmons' alleged use of the term vagina and you

12   never saw Ms. Simmons again and you never worked with

13   Ms. Simmons again, why did you feel unsafe?

14        A.    I didn't know if she was fired.  I didn't

15   know anything about it.  I want to get out to feeling

16   better job, as I said, for the safety, no harassment,

17   and, also, security for your old age, like pension

18   and medical.  As you are older, you need more

19   medical.

20        Q.    But your last several weeks of

21   working at the Holiday Inn, you never saw

22   Ms. Simmons?

23        A.    (Moves head from side to side.)

24        Q.    Right?

25        A.    Yeah.

# EXHIBIT "34"

CHERYL QUAST RESECK - EX. BY MR. MURRELL

1    BY MR. MURRELL:

2          Q.   Can you tell me what that is?

3          A.   It is the front of Shelby Simmons'

4    employment jacket, her folder.

5          Q.   Employment jacket?

6          A.   The jacket, folder jacket, of her

7    employment folder, the outside.

8          Q.   So it's not a separate form that goes

9    inside her folder?

10         A.   No.  It's the outside of the folder.

11         Q.   It's the actual folder itself?

12         A.   Exactly.

13         Q.   Now, what does it say at the bottom down

14   there in the very first written information?  Could

15   you just read all of that and what it means?

16         A.   I can't read the date.  Eight something

17   2000.  Terminated --

18         Q.   No.  I'm sorry.  I want you to read the

19   top one first, the very first one.

20         A.   This one?  (Indicating)

21         Q.   Yes.

22         A.   7/15/99, executive housekeeper.  She

23   started at 18,000 a year, and, at the time, she had

24   declined benefits.  So I was adding the difference

25   for what her benefit package would have been to pay.

CHERYL QUAST RESECK - EX. BY MR. MURRELL

1      Q.    And let me interrupt you real quick,

2   please.  Is that your handwriting?

3      A.    It is my handwriting.

4      Q.    And go ahead.  Read that last entry for

5   me.

6      A.    The last entry?

7      Q.    Yes.

8      A.    Date, August something 2000.  Terminated

9   breaking hotel policy.  See -- looks like SH file,

10  not rehireable.

11     Q.    I have a little bit of a darker copy.

12  Can you read that date on that darker copy there?

13     A.    Not legibly.

14     Q.    What does it look like to you?

15          MS. HORNE:  Object to the form.

16          THE WITNESS:  I see dots.  I mean, I

17  could guess at what it looked like, but I couldn't

18  say with 100 percent that's what it looked like.

19  BY MR. MURRELL:

20     Q.    Give me your best guess.  I mean, it's

21  your writing.  So I think you can discern your

22  writing probably better than I can.

23     A.    Well, but if there's nothing there, I

24  can't read it.  It looks like August 21 would be my

25  guess.


A. WILLIAM ROBERTS, JR., & ASSOCIATES

CHERYL QUAST RESECK - EX. BY MR. MURRELL

1      Q.    Okay.  So it would be August 21, 2000,

2    terminated breaking hotel policy?

3      A.    I believe that's what it says.

4      Q.    And it says:  See SH file.  What is the

5    SH file?

6      A.    The file that I held all the

7    documentation concerning Sabina's complaint.  It was

8    a file that was created after it was recommended to

9    me by counsel to maintain a file, and it held all the

10   correspondence that went between counsel and me and

11   anything that was done after speaking with counsel.

12     Q.    Do you know what date you first started

13   creating this sexual harassment file?

14     A.    No, not for sure.

15     Q.    It was in the year 2000, though; is that

16   right?

17     A.    Yes.  It was either August 8th or the

18   first morning of August 9th.  It was right then.

19     Q.    Okay.  By August 21st, it was already

20   created?

21     A.    Definitely.

22     Q.    Now, this says at the very end not

23   rehireable; is that correct?

24     A.    Right.

25     Q.    Why did you put that on there?

# EXHIBIT "35"

CHERYL QUAST RESECK - EX. BY MR. MURRELL

1          A.    Uh-huh.

2          Q.    When did she say that to you?

3          A.    Probably during the investigation phase

4     of the allegations.

5          Q.    And I think I may have asked you this.

6     So pardon me, if I did.  Have you ever had any sexual

7     harassment complaints before Ms. Carey made her

8     complaint to the hotel?

9          A.    No.

10         Q.    Have you had any complaints of sexual

11    harassment after Ms. Carey's complaint?

12         A.    No.

13         Q.    Has the policy at the hotel regarding

14    sexual harassment changed from --

15         A.    Yes.

16         Q.    -- 2000?

17         A.    Yes.

18         Q.    Okay.  Tell me how it's changed.

19         A.    We have put in place a more detailed

20    policy.

21         Q.    Do you have a copy of that detailed

22    policy?

23         A.    Not with me.

24         Q.    Okay.  Would you get a copy of that and

25    give that to your attorney so she can give it to me?

A. WILLIAM ROBERTS, JR., & ASSOCIATES

CHERYL QUAST RESECK - EX. BY MR. MURRELL

1        A.     Sure.

2        Q.     Okay.

3               (This page contains information to be

4    supplied by counsel and/or the deponent.)

5    BY MR. MURRELL:

6        Q.     Can you give me some specifics on how the

7    policy has changed?

8        A.     Just generally more detailed, and it has

9    some reporting procedures in it just -- I can't quote

10   you verbatim, but, I mean, just overall more

11   detailed.

12       Q.     Well, I realize you can't tell me word

13   for word what the policy says, but give me the

14   general gist of how it has changed.

15       A.     Basically it says the same thing as our

16   hotel rules policy said which is:  Harassment of no

17   kind will be tolerated whether it be sexual,

18   religious, racial, that we still -- that it's a zero

19   tolerance policy except it is spelled out broader.

20   It's the same policy.  It's just broader and a little

21   bit more concise and legally probably correct.

22       Q.     Can you think of something that you can

23   tell me about it that makes it broader and more

24   legally correct?  I mean, can you give me some

25   details about that?